## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| DAVID FRANKLIN OWEN, | § | Case No. 20-10752-tmd |
| *Debtor*. | § | |
| | § | |
| _____ | § | |
| | § | |
| LYDIA O. CHOPIN, | § | |
| *Plaintiff,* | § | Adv. Proc. No. _____ |
| v. | § | |
| DAVID FRANKLIN OWEN, | § | |
| *Defendant.* | § | |

## COMPLAINT FOR DETERMINATION OF DISCHARGEABILITY
## (PURSUANT TO SECTION 523 OF THE BANKRUPTCY CODE)

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Lydia O. Chopin ("Mrs. Chopin" or "Plaintiff"), and for her Complaint against Defendant/Debtor David Franklin Owen (the "Debtor") would respectfully show the following:

### I.
### Jurisdiction

1.      On June 30, 2020, the Debtor filed a voluntary petition (the "Petition") for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas.

2.      On August 6, 2020, the Debtor's duly-noticed meeting of creditors was held pursuant to Section 341(a) of the Bankruptcy Code (the "Section 341 Meeting").

3.      As of the date of this Complaint the Debtor has not been granted a discharge.

4.      This Complaint is timely because the date by which a Complaint to determine

dischargeability of a debt expires on October 5, 2020.

5.      This is an adversary proceeding in which the plaintiff/creditor is seeking a determination as to the dischargeability of the debt owed by the Debtor to plaintiff under Bankruptcy Code §§ 523(a)(2)(A) and 523(a)(4).

6.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and Bankruptcy Code § 523.

7.      This case is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and 157(b)(2)(J).

## II.
## Parties

8.      Plaintiff Lydia O. Chopin is an individual residing in Travis County, Texas.

9.      Plaintiff is a judgment creditor of the Debtor, and holds a perfected judgment lien against the Debtor.[1]

10.     Defendant is the Debtor in the above-captioned case and at all relevant times has resided at 611 Bissonet Ln., Austin, Texas 78752.

---

[1] Prior to the Debtor filing bankruptcy, Plaintiff perfected her judgment lien against Debtor:  Plaintiff obtained an Agreed Final Judgment against the Debtor on November 20, 2019, in Cause No. D-1-GN-13-003560 in the 345th Judicial District Court of Travis County, Texas.  Plaintiff filed an abstract of judgment with that court on November 21, 2019, which was indexed in the Real Property Records of Travis County, Texas, thereby perfecting that lien.  *See, e.g.*, *In re McLaughlin*, 217 B.R. 772, 774 (Bankr. W.D. Tex. 1998) (describing that creditor "had filed an abstract of judgment perfecting her judgment lien");  *In re Warren*, 217 B.R. 538, 539 (Bankr. S.D. Tex. 1997) ("A judgment lien attaches to property within a county at the time an abstract of judgment is recorded and indexed in the real property records of that county. Tex. Prop.Code § 52.001.").  Prior to Debtor filing bankruptcy, Plaintiff also obtained a writ of execution against Debtor on January 7, 2019, which was executed and returned by the constable nulla bona, which under Texas law remains valid for ten years.  As discussed below, pursuant to the terms of a settlement agreement and the underlying allegations of fraud and breach of fiduciary duty, the Debtor agreed and stipulated that the judgment against him would be non-dischargeable.

## III.
## Background Facts

11.    The references to the Debtor's testimony in the fact section below refers to testimony that Debtor gave in deposition and admissions he made in written discovery responses in Cause No. D-1-GN-13-003560, styled *Lydia O. Chopin v. David F. Owen*, *et al*. in the 345th Judicial District Court of Travis County, Texas (the "State-Court Lawsuit"), the same lawsuit in which Plaintiff, Mrs. Chopin, obtained her judgment against him.

12.    *Multiple bases for the Debtor's fiduciary duties to Mrs. Chopin*.  The Debtor owed both formal and informal fiduciary duties to Mrs. Chopin.  The Debtor's fiduciary relationship of trust and confidence toward Mrs. Chopin existed prior to, and apart from, the transactions at issue in this cause.  The Debtor also owed duties to Mrs. Chopin as a consequence of the formal fiduciary roles he undertook in the transactions at issue here, as broker, financial advisor, and agent.[2]

13.    The Debtor actively cultivated Mrs. Chopin's trust and reliance on him.  The Debtor falsely held himself out to Mrs. Chopin as a "multi-degreed professional" who has "completed" studies at the University of North Texas, Sacred Heart School of Theology, Marquette University, and the University of Texas Austin.  The Debtor admitted in discovery,

---

[2] *See, e.g.*, *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) ("Under the common law of most jurisdictions, including Texas, agency is also a special relationship that gives rise to a fiduciary duty.");  *Western Reserve Life Assur. Co. of Ohio v. Graben*, 233 S.W.3d 360, 374 (Tex. App. – Fort Worth 2007, no pet.) (when party "assumed the role to act as a financial advisor," any arms' length business transaction that may have existed between the parties "was elevated into a fiduciary relationship" which did not require proof of any prior confidential relationship);  *Kang v. Song*, 2016 WL 4903271 *7 (Tex. App. – Fort Worth Sept. 15, 2016, no pet.) ("An investment or financial advisor generally owes a fiduciary duty to clients");  22 Tex. Admin. Code § 531.1 ("A real estate broker or salesperson, while acting as an agent for another, is a fiduciary.");  *NRC, Inc. v. Huddleston*, 886 S.W.2d 526, 530 (Tex. App. – Austin 1994, no writ) (real estate agent breaches fiduciary duty by failing to fully disclose matters affecting the client's interests).

however, that he has no degree from The University of Texas. At least two of the degrees that the Debtor claims to have received from the University of North Texas (including his claim to have a Ph.D. from that university) are nonexistent.[3] Those false representations were calculated to build confidence in the Debtor's financial expertise and judgment. Just as important as the credentials that the the Debtor claimed, however, is the fact that the Debtor *lied* about them. The fact that the Debtor had fabricated credentials was itself material information that needed to be disclosed to her, as it would have alerted Mrs. Chopin that the the Debtor not only lacked the credentials he claimed to have, but also lacked truthfulness and integrity as well.

14.     The Debtor also served as agent and broker for Mrs. Chopin and her late husband in multiple real estate deals over a ten-year period, advised Mrs. Chopin regarding investment opportunities during that time period, obtained federal income tax returns and brokerage statements from Mrs. Chopin on an annual basis, and actively encouraged Mrs. Chopin's trust and confidence in his judgment on financial and personal matters.

15.     The Debtor was aware that Mrs. Chopin is a practicing Catholic. The Debtor falsely portrayed himself as a priest in good standing with the Church, to reinforce Mrs. Chopin's confidence in him, and to build trust in his honesty and integrity. The Debtor wore a priest's collar and clerical clothing to at least one real estate closing for Mrs. Chopin, as well as to her husband's funeral. The Debtor was no longer an active priest when he engaged in those

---

[3] The Debtor testified that he obtained a BA in "Philosophy" from the University of North Texas (UNT) in 1975, and in online statements has claimed that he has three degrees (including a Ph.D.) from that university. The Debtor obtained a B.A. degree in General Studies from UNT on May 13, 1989, but the Registrar confirmed that Debtor has never received any other degrees from that university, including no Ph.D., no degrees in Philosophy or General Business, and no degree (BBA or otherwise) from 1975. Mrs. Chopin is pursuing further discovery to confirm the extent to which Debtor falsely represented his educational record at each of the institutions from which he claims to have graduated, relevant to the expertise Debtor held out to Mrs. Chopin in gaining her trust.

actions.

16.     In the years following her husband's death, Mrs. Chopin's trust and confidence in the Debtor as an adviser on financial affairs grew to the point that she entrusted him with copies of her tax returns and periodic brokerage statements.  The Debtor testified in the underlying state court lawsuit that he regularly received copies of Mrs. Chopin's federal income tax returns once a year, as well as copies of her brokerage account statements once or twice each year.

17.     In addition to providing financial and personal advice to Mrs. Chopin over the course of a decade, the Debtor had previously established formal fiduciary relationships with Mrs. Chopin as her real estate agent, further building her trust and reliance on them.  The Debtor and his company Realty served as the real estate agent for Mrs. Chopin on a number of real property transactions over a period of more than ten years.  The Debtor, acting through a home building company that he owned and controlled, convinced Mrs. Chopin to purchase a lot located at 716 Post Oak Street in Austin, and to build a spec house there.  The Debtor, acting individually and through his companies, also assisted Mrs. Chopin in purchasing and leasing other houses, and also in obtaining financing.

18.     The Debtor also served in additional fiduciary roles for Mrs. Chopin in 2011 in connection with the transactions at issue in this cause.  The Debtor served as Mrs. Chopin's principal contact and financial adviser.[4]  The Debtor has acknowledged he was aware that Mrs. Chopin was relying on him to collect and evaluate all of the relevant information relating to the proposed transactions, including advising her of all the strengths and weaknesses of the proposed

---

[4] The Debtor acknowledged that Mrs. Chopin engaged him to "advise her on the loan," and to conduct due diligence and underwriting on her behalf.  In e-mails to borrowers relating to the transactions at issue, the attorney for the Debtor and his businesses at the time of these transactions also referred to the Debtor as one of Mrs. Chopin's "financial advisors."

terms.

19.     The Debtor also served in a fiduciary role as real estate agent for Mrs. Chopin in connection with the sale of the house that the Debtor and his company had built at 716 Post Oak Street, which was an integral part of the transactions at issue in this case.

20.     *Undisclosed rejections of loans to the same borrowers*.   When the Debtor approached Mrs. Chopin about the prospect of loaning money to third-party borrowers, and throughout the time period that the Debtor was under fiduciary obligations to Mrs. Chopin, he did not disclose to her that he had previously considered having his own company make a loan to the same borrowers, in substantially smaller amounts, and had previously rejected the transaction as far too risky.  By concealing those facts and pushing Mrs. Chopin to loan an even greater amount to the same borrowers, the Debtor was able to retain financial benefits that he and his companies had sought to obtain when they negotiated to loan money themselves, but with Mrs. Chopin bearing all of the unreasonable risk.

21.     The Debtor and two of his "Pride of Austin" companies were in the business of hard-money lending.  Working in conjunction with those entities and serving as their manager, the Debtor purported to be a professional in lending money to borrowers who do not qualify for conventional loans.  The Debtor professed to have expertise in properly evaluating and making loans.  The Debtor held himself out as an expert in real estate, lending, and investments.  The Debtor advertised himself as providing the highest quality real estate representation possible to his clients and stated he has a conservative approach to managing investments.

22.     In 2011, Darryl Mayfield ("Mayfield") and Acme Printing Co. Inc. ("Acme Printing") approached the Debtor about obtaining a $2,000,000 business loan from a company

that Debtor co-owned and managed, the Pride of Austin High Yield Fund (the "POA High Yield Fund"), in connection with a printing business in Iowa.[5]  The Debtor was adamant that "the High Yield Fund would never lend $2 million to Acme," but attempted to broker the requested loan to others, including Mrs. Chopin.  In late August 2011, however, the Debtor wrote Mayfield that Mrs. Chopin was "going to pass" on making a loan, noting that if anything went wrong and she had to cover the $2 million "it would crush her financially."

23.     In September 2011, the Debtor evaluated whether the POA High Yield Fund itself would loan money to Mayfield and Acme Printing, but in the much smaller sum of $500,000.  The Debtor's company, Pride of Austin Capital Partners, signed a "Commitment Letter with Stipulations" on September 6, 2011, conditionally agreeing to fund a $500,000 loan.  To facilitate that deal, a principal in Acme Printing (Thomas I. Morgan) invested $250,000 in the POA High Yield Fund on September 9, 2011, and Acme Printing made an additional $50,000 investment in the POA High Yield Fund on September 15, 2011.  The $250,000 and $50,000 subscriptions were to be used, in turn, as part of a "dollar for dollar ratio for collateral" on the proposed $500,000 loan by POA High Yield Fund.

24.     Almost immediately, however, the Debtor concluded that making a loan — even on the smaller $500,000 loan amount — would present unreasonable risk to the POA High Yield Fund.  The Debtor received an e-mail from the co-manager of his companies on September 21, 2011, regarding the borrowers' financials: "Wow.  Cash is flying out and AR is constant.  They are losing money badly."  The Debtor responded, "It seems the more they provide the more questions that rise."  His co-manager replied, "Their financial health is a big concern."  The

---

[5] "POA" refers to "Pride of Austin," the business name that the Debtor used for all of the entities he co-owned and co-managed during the time period in question.

Debtor rejected having his company make a $500,000 loan.

25.    The Debtor also turned down Mayfield's and Acme Printing's subsequent request for an even smaller loan — for $300,000 — again concluding that a loan in that amount to Mayfield and Acme posed unreasonably risk.  The Debtor advised Mayfield on September 30, 3022, that the Debtor and his attorney had all "looked at the loan request from every angle," and could not agree to fund a $300,000 loan request, noting that such a loss "would be devastating to our investors."

26.    The Debtor nevertheless continued to approach Mrs. Chopin repeatedly to make a *$2,000,000* loan to Acme Printing, preying on her desire to sell the house at 716 Post Oak Street to facilitate such a transaction.  The Debtor did not disclose to Mrs. Chopin that he had previously evaluated loans for far lesser amounts to the same borrowers, and had rejected those transactions as unsound and potentially devastating.  The Debtor also failed to share with Mrs. Chopin any of the e-mails regarding the heightened risks of making a loan and the "devastating" impact a breach would have, when he evaluated making even a $300,000 - $500,000 loan.

27.    *The Debtor's continued solicitation of Mrs. Chopin, while serving as a fiduciary, and undisclosed communications about how that would benefit him and his companies*.  On October 31, 2011, the Debtor secretly e-mailed Mayfield on the topic of "Lydia Revisited," reporting on his efforts to change Mrs. Chopin's mind on making a loan.  The Debtor disclosed confidential information he had gained through his fiduciary relationship with Mrs. Chopin, informing Mayfield that Mrs. Chopin "has three investment accounts," and disclosing information about each account.  Mrs. Chopin's second account at USAA barred liens from outside banks, but the Debtor suggested that Mayfield might look into whether "a high ranking

military officer" could call USAA to discuss loosening that obstacle. The Debtor reported that although Mrs. Chopin "did not say that she would move forward with a deal in Iowa," she indicated "she would listen to me" if they could take care of the Post Oak property that the Debtor had been trying to sell for her, which Mrs. Chopin considered an "albatross."

28.     In return for targeting and delivering Mrs. Chopin as a lender, the Debtor negotiated with the borrowers for benefits that would accrue solely to the Debtor and his Pride of Austin companies, including to keep at least $250,000 of the earlier investments in the POA High Yield Fund from being withdrawn, and secretly negotiated for Mayfield and his businesses to market and help grow investors for the POA High Yield Fund.

29.     The Debtor, acting as both loan adviser and real estate agent to Mrs. Chopin, orchestrated a transaction where Acme Printing would purchase Mrs. Chopin's house at 716 Post Oak Street pursuant to a Residential Sales Contract (the "Post Oak Sales Contract"). The special provisions of the Post Oak Sales Contract provided that Mrs. Chopin would enter into a Credit Enhancement Agreement (which was attached as an addendum to the Post Oak Sales Contract), which would assist Acme Printing in acquiring a large loan. The Credit Enhancement Agreement specified that Mrs. Chopin was to allow Acme Printing access to her assets for credit enhancement to induce a lender to loan between $2,000,000 and $3,000,000 to Acme Printing. At the time, Mrs. Chopin had no experience with credit enhancement agreements, and had no experience in lending, in evaluating loans, in evaluating borrowers for lending purposes, in evaluating collateral securing loans, or in evaluating the creditworthiness of a business. Mrs. Chopin relied upon her real estate broker and fiduciary, the Debtor, for advice and guidance on whether to enter into this type of transaction to sell her house.

30.     Thereafter, the Debtor structured a Modification and Amendment to Credit Enhancement Agreement (the "Modification to Credit Enhancement Agreement"). The agreement contemplated that Mrs. Chopin would borrow $2,250,000 from Morgan Stanley Smith Barney ("MSSB") and disburse $2,000,000 of those funds to Acme Printing and others, and disburse $40,000 of those funds to one of the Debtor's (Pride of Austin Capital Partners) as a fee for facilitating the transaction. Upon the election to proceed with the transaction, Acme Printing was to fulfill the terms of the Post Oak Sales Contract, with a $36,000 broker fee going to the Debtor's realty company.

31.     On the side, the Debtor used the prospect of Mrs. Chopin's loan to engage in self-dealing for the POA High Yield Fund as well:  contingent on the above loan transaction from Mrs. Chopin taking place, the Debtor negotiated for Acme Printing to purchase Thomas Morgan's $250,000 investment in the POA High Yield Fund, to take place immediately upon the closing of Mrs. Chopin's loan to Acme. The Debtor's side deal was designed to keep the $250,000 investment in the POA High Yield Fund, instead of refunding that sum back to Morgan.[6]

32.     In sum, the Debtor, while acting as fiduciary to Mrs. Chopin, extracted the same benefit he had anticipated receiving if he and his companies had made the smaller loans to the

---

[6] After the Debtor decided against POA High Yield Fund loaning money itself to the borrowers, Acme Printing's principal (Thomas I. Morgan) sought to have his $250,000 investment in the POA High Yield Fund refunded to him. The POA High Yield Fund initially agreed to refund the $250,000 to Morgan in a series of payments in 2012. To avoid that material loss to the POA High Yield Fund, however, the Debtor then negotiated for Acme Printing to purchase Morgan's $250,000 investment (thereby keeping those monies in the POA High Yield Fund), which was dependent upon the closing on Mrs. Chopin's loan to the Acme Borrowers. When Mrs. Chopin's $2.25 million loan to the Acme Borrowers closed on December 29, 2011, Acme Printing and the POA High Yield Fund (through the Debtor and his co-manager) simultaneously executed an assignment under which Acme Printing would purchase Thomas Morgan's subscription.

borrowers, but instead of loaning the money themselves, shifted the risk of a "devastating" loss over to Mrs. Chopin.  The borrowers had invested $300,000 in the POA High Yield Fund based on the expectation that the Debtor would cause POA High Yield Fund to make a loan to them. Once those earlier loan transactions fell through, the Debtor targeted Mrs. Chopin to borrow a much greater sum, and then to loan it out to the borrowers.  The Debtor engaged in self-dealing by negotiating a side deal with the borrowers, designed to keep at least $250,000 of the investment in the POA High Yield Fund from being refunded, which was contingent on Mrs. Chopin making her loan.  The deal as structured by the Debtor would also generate another $76,000 which would accrue to his companies, POA Capital Partners and POA Realty.

33.     On the side, the Debtor also secretly negotiated for other financial benefits for himself and his companies.  On December 27, 2011, just two days before the closing on the transactions for Mrs. Chopin, the Debtor e-mailed Mayfield about delivering "on all that you [Mayfield] have been talking about to me," including Mayfield's company "Marketing the High Yield Fund," building a "sales force bringing in investors" for the POA High Yield Fund, building a relationship with Principal Financial "to bring in more investments into the fund," and other listed business endeavors.  The Debtor had also discussed becoming a "consultant" for Mayfield in starting his own equity fund.  The Debtor wrote that all of these side benefits he and Mayfield had discussed for the POA High Yield Fund "starts with the closing of the loan from Lydia," which was to close two days later.  None of these side negotiations and communications were disclosed to Mrs. Chopin, however, including the existence of the Debtor's inherent conflict of interest in self-dealing while simultaneously serving as her fiduciary.[7]

---

[7] Despite their fiduciary obligations to Mrs. Chopin, and in addition to not disclosing their conflicts of

34.    _Additional fraudulent omissions and misrepresentations_.    The Debtor was to perform all of the due diligence and underwriting to determine whether it would be in Mrs. Chopin's best interests to borrow and then loan in excess of $2,000,000 to Acme Printing and others and related transactions.  The Debtor knew that the loan transaction was too risky for the POA High Yield Fund (even at the $300,000 level), knew that the loan transaction was improperly and under collateralized, and knew that the borrowers had concealed the existence of a lien on collateral and other harmful information.

35.    Nevertheless, the Debtor told Mrs. Chopin that work orders and awards would be received by Acme or its affiliates in 2012 to repay all amounts funded by Mrs. Chopin.  Despite his fiduciary roles, the Debtor did not explain the risk.  The Debtor also failed to disclose to Mrs. Chopin copies of e-mails in which he questioned the honesty of the borrowers, which directly contradicted the representations made to her about the strengths of entering into the transactions.[8]

36.    _False portrayal of underwriting results_.    The Debtor perpetrated a self-dealing transaction to obtain the financial benefits for himself and his companies, as discussed in the undisclosed e-mails between the Debtor and the borrowers, at the expense of his fiduciary beneficiary Mrs. Chopin.

37.    On December 28, 2011, the day before the transactions closed, the Debtor met with Mrs. Chopin and presented her with the results of the underwriting, which included a

---

interest, the Debtor also admitted that they never advised Mrs. Chopin to consult an _independent_ underwriter or attorney regarding any of the transactions at issue.  While holding himself out as an expert on financial matters, Debtor knew Mrs. Chopin herself was a widowed housewife with no such expertise.  Mrs. Chopin had obtained a teaching degree, but never worked outside the home after her marriage.

[8] The Debtor's fraudulent concealments and failures to disclose are part of a pattern and practice that permeated all of his dealings, dating back to when he was contemplating a $500,000 loan directly from POA High Yield Fund.

notebook of relevant documents, and a Summary of Strengths and Weaknesses (the "Strengths and Weaknesses Memo") of entering into the transactions.

38. Despite his fiduciary obligation, the Debtor did not disclose that he had previously rejected making loans to the same borrowers (for a fraction of the principal amount) as too risky and potentially "devastating," and that no other lender that the borrowers approached would loan any money to them. No mention of those facts appears anywhere in the Strengths and Weaknesses Memo nor does the memo mention his conclusions about the borrowers' lack of integrity. Instead, the Strengths and Weaknesses Memo (and an accompanying notebook that the Debtor gave to Mrs. Chopin) emphasized unsubstantiated strengths of entering into the transactions, without proper underwriting to support the assertions.

39. Instead of making any of those disclosures, including the side transactions he was discussing between himself and the borrowers commencing with Mrs. Chopin's loan, the Debtor wrote Mrs. Chopin that there was almost nonexistent risk: "Obviously the Fed government can go bankrupt tomorrow and it will all stop. But then also the possibility exists that Wall Street can be bombed and our economy plunged into the dark ages." Barring those absurd scenarios, the Debtor recommended to Mrs. Chopin that she move forward with loaning the money to the borrowers.

40. _Closing on the transactions_. In reliance on the Debtor, and unaware of the facts that he concealed from her, Mrs. Chopin entered into the transactions. On or about December 29, 2011, Mrs. Chopin borrowed $2,250,000 from MSSB, and disbursed $2,000,000 to Acme Printing, America Renewed Training Systems, L.L.C. (an affiliate of Acme Printing, which is hereafter referred to as "ARTS"), Mayfield, and other related parties (collectively the "Acme

13

Borrowers"). Mrs. Chopin also disbursed $40,000 to the Debtor's company, POA Capital Partners. Also on December 29, 2011, the Debtor executed an Assignment and Sale of Membership Interest with Acme Printing (the "Assignment") on behalf of POA High Yield Fund, pursuant to his side deal with the borrowers to keep the $250,000 investment in the POA High Yield Fund. The cost of preparing the Assignment was charged to Mrs. Chopin and was to be paid by Acme Printing.

41.     The Acme Borrowers did not perform as agreed. Acme Printing did not purchase the house on Post Oak, and did not pay as agreed. In early 2012, the long-time attorney for the Debtor and his companies e-mailed Mrs. Chopin (copied to the Debtor), informing her that she would likely lose a large portion of her retirement portfolio at MSSB if she did not fund more money to the Acme Borrowers to assist the businesses. In early 2012, an additional $250,000 was loaned by Mrs. Chopin to the Acme Borrowers. After she did so, the loans were still not repaid.

42.     The loan documents as structured by the Debtor also severely limited Mrs. Chopin's ability to collect from the borrowers. Among other defects, the Secured Promissory Note dated December 29, 2011, provided that "No interest accrues on any portion of this promissory note until it is matured and unpaid," and stated that the "Maturity Date" is as "provided in the Indemnity Agreement." The Indemnity Agreement, however, did not contain any maturity date, and did not even mention "maturity" anywhere in its body. As structured by the Debtor, so long as the Acme Borrowers made interest-only payments on Mrs. Chopin's loan with MSSB, they would never have an obligation to repay the $2.25 million loan.

43.     In sum, the Debtor (Mrs. Chopin's fiduciary) structured a deal in which Mrs.

Chopin would put up her own collateral and borrow money from MSSB, and then turn around and loan those funds to the Acme Borrowers. The Acme Borrowers were not required to pay any interest to Mrs. Chopin, nor make principal payments to her, and were required only to make interest payments (but not principal) on Mrs. Chopin's loan with MSSB (which Mrs. Chopin would not have borrowed except to fund the transactions benefitting her fiduciary). The Debtor and his companies, on the other hand, were to obtain substantial benefits. Contingent on Mrs. Chopin's loan funding, Acme Printing would keep the $250,000 investment in the POA High Yield Fund by buying out Thomas Morgan's subscription, a portion of Mrs. Chopin's funds would be used to pay POA Capital Partners a $40,000 brokerage fee, and another $36,000 would be paid to POA Realty in connection with the Post Oak sale.

44.     The Debtor retained benefits of their self-dealing, at the expense of his fiduciary beneficiary, Mrs. Chopin. Mrs. Chopin, on the other hand, was left with almost immediate nonperformance by the Acme Borrowers, and a continuing obligation to pay on the MSSB loan. The individual Acme Borrowers ended up filing bankruptcy. Acme Printing and its affiliated entities went out of business.

45.     *Fabrication of evidence and spoliation*. On October 27, 2013 — three days after the Debtor and the POA entities were served with copies of pleadings in this cause — the Debtor retrieved an electronic copy of the Strengths and Weaknesses Memo, and materially altered the document by inserting language about multiple different weaknesses. The Debtor then produced a copy of the fabricated document in discovery. Roughly one month before he was deposed, the Debtor materially altered the Strengths and Weaknesses Memo a second time, which the the Debtor then produced the day before his first deposition. The Debtor then lied in his first

deposition, claiming that the version of the Strengths and Weaknesses Memo given to Mrs. Chopin back on December 28, 2011, had contained the altered language. The same week that the Debtor was deposed the first time, the Debtor caused the computer on which the fabrications were made to be discarded. The Debtor then lied again about the fabricated documents in his second deposition.

46. Mrs. Chopin's forensics expert detected the alterations by examining the metadata for the two falsified documents. After the Debtor was caught fabricating evidence, he admitted that the version of the Strengths and Weaknesses Memo produced by Mrs. Chopin (without his multiple alterations) is the document given to her on December 28, 2011.

**IV.**
**Mrs. Chopin's State-Court Lawsuit,**
**and final judgment entered against the Debtor**

47. On October 14, 2013, Mrs. Chopin filed the State-Court Lawsuit against the Debtor and his co-conspirators. After discovery, in which Mrs. Chopin learned of the Debtor's self-dealing with the borrowers, and the falsity of his prior representations to her while serving as her fiduciary, Mrs. Chopin amended her pleadings to assert that Debtor committed fraud (both fraudulent statements and fraudulent concealment), statutory fraud in a real estate or stock transaction, breach of fiduciary duty, and negligence and negligent misrepresentation.

48. On December 5, 2017 — shortly before the State-Court Lawsuit was set to go to trial — the Debtor and Mrs. Chopin entered into a settlement agreement styled "Agreement Concerning Judgment," whereby the Debtor agreed to make monthly payments to her as set out in the agreement. In the event the Debtor defaulted on those payments, then Mrs. Chopin could have an Agreed Final Judgment entered against the Debtor in a form attached to the settlement

agreement for $850,000, consisting of a portion of her still-unrecovered out-of-pocket damages.

49.     Based on the nature of the factual allegations and claims for fraud and breach of fiduciary duty, part of Mrs. Chopin's requirements for settlement was that the Debtor agree that his indebtedness to her would be nondischargeable in the event he went into bankruptcy:

> "The Parties stipulate and agree that the Judgment is non-dischargeable in bankruptcy."

While many courts hold that a pre-petition stipulation of nondischargeability is not enforceable in itself, that stipulation was an acknowledgement by the Debtor that the evidence obtained in discovery in the State Court Lawsuit, outlined in the state-court pleadings and again in this Complaint, would bar dischargeability if presented again in bankruptcy.

50.     The Debtor defaulted on his payments, and after failing to cure same, Mrs. Chopin gave notice that she was having the Agreed Final Judgment entered by the Court.  The Agreed Final Judgment was entered on November 20, 2019, for $850,000, with post-judgment interest at the rate of 6% per annum.  Mrs. Chopin filed a notice of credit of $71,600 against that judgment the same day, leaving a remaining principal balance of $778,400 on the state court judgment against the Debtor.

51.     The state-court judgment against the Debtor has not been appealed, vacated, or modified, and became final prior to when Debtor filed bankruptcy.  As set out in footnote 1 above, Mrs. Chopin's judgment lien has been fully perfected by the filing and indexing of an abstract of judgment in the Real Property Records of Travis County, Texas, and through the writ of execution that has been returned, which occurred prior to when Debtor filed this bankrupty.

**V.**
### Count I – Non-Dischargeability of Mrs. Chopin's judgment
### under Section 523(a)(2)(A) of the Bankruptcy Code

52.    Mrs. Chopin repeats and re-alleges the allegations set forth in paragraphs 1 through 51 of this Complaint as if set forth at length herein.

53.    Bankruptcy Code § 523(a)(2)(A) provides, in relevant part, that:

(a)   A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; …

54.    All or part of the debt owed to Mrs. Chopin, as evidenced by the $850,000 Agreed Final Judgment entered against the Debtor after the $71,600 credit is applied, is non-dischargeable as it is a debt for money, property, services, or an extension, renewal or refinancing of credit, that was obtained by false pretenses, a false representation, or actual fraud within the meaning of Bankruptcy Code §§ 523(a)(2)(A).

**VI.**
**Count II – Non-Dischargeability of Mrs. Chopin's judgment**
**under Section 523(a)(4) of the Bankruptcy Code**

55.    Mrs. Chopin repeats and re-alleges the allegations set forth in paragraphs 1 through 54 of this Complaint as if set forth at length herein.

56.    Bankruptcy Code § 523(a)(4) provides, in relevant part, that:

(a)   A discharge under section 727, 1141, 1192, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; …

57.    All or part of the debt owed to Mrs. Chopin, as evidenced by the $850,000 Agreed

Final Judgment entered against the Debtor after the $71,600 credit is applied, is non-dischargeable as it is a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny within the meaning of Bankruptcy Code §§ 523(a)(4).

WHEREFORE, Plaintiff Lydia O. Chopin prays that the Court enter a Judgment determining that the debt reflected in the Agreed Final Judgment entered in favor of Mrs. Chopin on November 20, 2019, is non-dischargeable under Bankruptcy Code §§ 523(a)(2)(A) and 523(a)(4), and granting Mrs. Chopin such other and further relief to which this Court may determine Mrs. Chopin is justly entitled.

Respectfully submitted,

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2700
Austin, TX 78701
Telephone: 512.480.5626
Facsimile: 512.536.9926
bcumings@gdhm.com

By: /s/ *Brian T. Cumings*
        Brian T. Cumings
        State Bar No. 24082882
        Eric G. Behrens
        State Bar No. 02050700
        ebehrens@gdhm.com

**COUNSEL FOR PLAINTIFF/CREDITOR
LYDIA O. CHOPIN**

# <u>CERTIFICATE OF SERVICE</u>

By my signature above, I hereby certify that on September 29, 2020, a true and correct copy of the foregoing document was served upon the following parties via electronic means as listed on the Court's ECF noticing system or by regular first-class mail, postage prepaid.

David Franklin Owen
611 Bissonet Lane
Austin, TX 78752
DEBTOR

Todd Brice Headden
Hajjar Peters LLP
3144 Bee Caves Rd.
Austin, TX 78746
ATTORNEYS FOR DEBTOR

John Patrick Lowe
2402 East Main Street
Uvalde, Texas 78801
CHAPTER 7 TRUSTEE

United States Trustee
903 San Jacinto, Suite 230
Austin, Texas 78701

/s/ *Brian T. Cumings*